## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: HAIR RELAXER SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 3060<br><br>Master Docket Case No. 1:23-cv-00818<br><br>Honorable Mary M. Rowland |
| **SHAWN BUCHANAN,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., SOFT-SHEEN CARSON, LLC, SOFT SHEEN\* CARSON (W.I.), INC., AVLON INDUSTRIES, INC., AVLON INTERNATIONAL, INC. MCBRIDE RESEARCH LABORATORIES, INC., and DUDLEY BEAUTY CORP., LLC,**<br><br>**Defendants.** | COMPLAINT AND JURY DEMAND<br><br>Civil Action No.: <u>1:23-cv-4026</u> |

Plaintiff files this Complaint pursuant to CMO No. 2, and are to be bound by the rights, protections and privileges, and obligations of that CMO and other Orders of the Court. Further, in accordance with CMO No. 2, Plaintiff hereby designates the United States District Court for the Northern District of Texas as plaintiff's designated venue ("Original Venue"). Plaintiff

makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in Fort Worth, Texas;

X Plaintiff purchased and used Defendant(s)' products in Fort Worth, Texas;

__ The Original Venue is a judicial district in which Defendant _____ resides, and all defendants are residents of the State in which the district is located (28 USC 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically, (28 USC 1391(b)(2)): Plaintiff used Defendant's products in Texas. Plaintiff's cancer diagnosis occurred in Texas.

__ There is no district in which an action may otherwise be brought under 28 USC 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC 1391(b)(3)).

__ Other reason (please explain): _____.

## **COMPLAINT**

SHAWN BUCHANAN ("Plaintiff"), by the undersigned counsel, make the following Complaint ("Complaint") against Defendants L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., SOFT-SHEEN CARSON, LLC, SOFT SHEEN* CARSON (W.I.), INC., AVLON INDUSTRIES, INC., AVLON INTERNATIONAL, INC. MCBRIDE RESEARCH

LABORATORIES, INC., and DUDLEY BEAUTY CORP., LLC, (collectively, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.     This action arises out of Ms. Buchanan's diagnosis of ovarian cancer. Ms. Buchanan's ovarian cancer was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in DEFENDANTS' hair care PRODUCTS.

2.     Plaintiff brings this action against DEFENDANTS for claims arising from the direct and proximate result of DEFENDANTS, their directors, agents, heirs and assigns, and/or their corporate predecessors', negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the hair relaxer PRODUCTS known as "Affirm Conditioning Crème Relaxer System", "Design Essentials Regular Conditioning Relaxer", "Dudley's Permanent Crème Relaxer", and "Mizani Butter Blend Relaxer" (collectively, the "PRODUCTS.")

3.     Plaintiff's use of toxic chemical hair straightening products designed or manufactured by the Defendants was a direct result of Defendants' wrongful marketing practices. Defendants systematically misrepresented and continue to misrepresent the significant health impacts of hair relaxer use, all while targeting women of color and taking advantage of centuries of racial discrimination and cultural coercion which emphasized—both socially and professionally—the necessity of maintaining straight hair.

4.     Rather than disclosing the risks and warning women and children, Defendants exploited for profit this deep-rooted connection between hair and identity in how they chose to market their hair relaxer products.

5.      Defendants' advertising and marketing of their hair relaxer products, and Defendants' failures to take reasonable and necessary steps to protect Plaintiff from harm, (1) exposed Plaintiff to brutally toxic products without warning; and (2) amplified institutionalized systems of discrimination that have minimized the cultural identity and heritage of women of African descent.

6.      Defendants advertised their hair relaxer products as, inter alia, "organic," "safe," "botanicals," "natural," and "ultra-nourishing" in newspapers, magazines, and media predominantly consumed by Black and Brown women. The advertisements, commercials, and packaging for Defendants' hair relaxer products feature almost exclusively women of color with smooth hair texture.

7.      Consumers of hair relaxer products relied on Defendant's misrepresentations and were misled as to the products' safety, and as a result have suffered traumatic injuries including uterine and ovarian cancer.

## I.    PARTIES

8.      Plaintiff is, and at all times relevant to this action was, a citizen and resident of the State of Texas, County of Tarrant.

9.      Defendant L'ORÉAL USA, INC. is, and at all times relevant to this action was, a Delaware corporation with its principal place of business and headquarters located at 575 5th Ave., 28th Fl., New York, NY 10017.

10.      Defendant L'ORÉAL USA PRODUCTS, INC. is, and at all times relevant to this action was, a Delaware corporation with its principal place of business and headquarters located at 112 Madison Ave., 12th Fl., New York, NY 10016.

11.     Defendant SOFT SHEEN-CARSON, LLC is, and at all times relevant to this action was, a New York limited liability company with its principal place of business and headquarters located at 575 5th Ave., 19th Fl., New York, NY 10017.

12.     Defendant SOFT SHEEN-CARSON (W.I.), INC. is, and at all times relevant to this action was, a Delaware corporation, and process may be served upon its registered agent, Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware 19808.

13.     On information and belief, Defendant L'ORÉAL USA PRODUCTS, INC. and SOFT SHEEN-CARSON, LLC, and SOFT SHEEN-CARSON (W.I.), INC. are subsidiaries of Defendant L'ORÉAL USA, INC. Defendants L'ORÉAL USA PRODUCTS, INC., SOFT SHEEN-CARSON, LLC, SOFT SHEEN-CARSON (W.I.), INC., and L'ORÉAL USA, INC. are collectively referred to herein as Defendant "L'ORÉAL."

14.     Defendant AVLON INDUSTRIES, INC. is, and at all times relevant to this action was, an Illinois corporation with its principal place of business and headquarters located at 1999 N 15TH Ave., Melrose Park, IL 60160.

15.     Defendant AVLON INTERNATIONAL, INC. is, and at all times relevant to this action was, an Illinois corporation with its principal place of business and headquarters located at 1999 N 15th Ave., Melrose Park, IL 60160. On information and belief, Defendant AVLON INDUSTRIES, INC. is a subsidiary of Defendant AVLON INTERNATIONAL, INC. Defendants AVLON INDUSTRIES, INC. and AVLON INTERNATIONAL, INC. are collectively referred to herein as Defendant "AVLON."

16.     Defendant MCBRIDE RESEARCH LABORATORIES, INC. is, and at all times relevant to this action was, a Georgia corporation doing business as Design Essentials with its

principal place of business at 2272 Park Central Blvd., Decatur, GA 30035. Defendant MCBRIDE RESEARCH LABORATORIES, INC. is herein referred to as "DESIGN ESSENTIALS."

17.    Defendant DUDLEY BEAUTY CORP., LLC is, and at all times relevant to this action was, a North Carolina limited liability company with its principal place of business at 1814 Eastchester Dr., High Point, NC 27265. Defendant DUDLEY BEAUTY CORP., LLC is herein referred to as "DUDLEY'S."

18.    At all times hereinafter alleged, "DEFENDANTS" or "All DEFENDANTS" include all herein named Defendants, inclusive.

19.    At all times material hereto, All DEFENDANTS were engaged in the research, development, manufacture, design, testing, assembly, packaging, labeling, preparation, distribution, marketing, supply and sale of the PRODUCTS, and introduced such PRODUCTS into interstate commerce with knowledge and intent that such PRODUCTS be sold in the State of Texas.

20.    At all times material hereto, DEFENDANTS researched, developed, manufactured, designed, tested, assembled, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective hair relaxer PRODUCTS, including but not limited to:

    a.  Design Essentials Regular Conditioning Relaxer;

    b.  Dudley's Permanent Crème Relaxer;

    c.  Mizani Butter Blend Relaxer; and

    d.  Affirm Conditioning Crème Relaxer System

21.    These PRODUCTS were all sold separately as new either directly or indirectly, to members of the general public within the State of Texas, including Plaintiff at each use.

22. DEFENDANTS' defective hair PRODUCTS were placed into the stream of interstate commerce and were used by the Plaintiff beginning in or around 2005 until in or around 2017.

23. In or around 2020, Plaintiff was diagnosed with ovarian cancer, a diagnosis caused by Plaintiff's exposure to chemicals in the DEFENDANTS' hair care PRODUCTS. As a result of this devastating diagnosis, Plaintiff had and continues to undergo treatment including chemotherapy and a total hysterectomy.

## II. JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and DEFENDANTS are residents of different states.

25. Upon information and belief, at all relevant times, DEFENDANTS were present and transacted, solicited and conducted business in the State of Texas through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

26. At all relevant times, DEFENDANTS expected or should have expected that their acts and omissions would have consequences within the United States and the State of Texas.

27. This Court has personal jurisdiction over DEFENDANTS because they conduct business in Texas, purposefully direct and/or directed their actions toward Texas, consented to being sued in Texas by registering an agent for service of process in Texas, and/or consensually submitted to the jurisdiction of Texas when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Texas necessary to constitutionally permit this Court to exercise jurisdiction.

28.     Moreover, DEFENDANTS' actions and/or inactions described herein were purposefully directed at and/or within the State of Texas in that they sold PRODUCTS directly to Plaintiff within the State of Texas, the damages were sustained by Plaintiff within the State of Texas, and the damages sustained by Plaintiff were a result of DEFENDANTS' actions and/or inactions—described herein—that were purposefully directed at and/or within the State of Texas.

29.     Venue in this District is proper under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and Plaintiff resides in this District.

30.     Venue is proper in this district pursuant to 28 U.S.C. §§1391(a) and (b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the DEFENDANTS are subject to this Court's personal jurisdiction. Venue is also proper under 18 U.S.C. § 1965 (a) because DEFENDANTS transact substantial business in this district.

### III.     FACTS COMMON TO ALL COUNTS

A.     Marketing and History of Hair Relaxers

31.     Black people make up about 13 percent of the U.S. population, but by one estimate, African-American spending accounts for as much as 22 percent of the $42 billion-a-year personal care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients– than Americans as a whole.[1]

---

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

32.     It is not surprising that the hair care industry targets Black consumers with specific products, because in the U.S., Black consumers spend over $1 trillion each year, with a significant amount of that spending going to hair care products.

33.     In its natural or virgin state, afro-textured hair is characterized by coily, springing, zigzag, and s-curve curl patterns, as well as its density, fullness, texture, and feel.[2] Afro-textured hair naturally grows up and out.[3]

34.     In Africa, hair was seen as a source of personal and spiritual power.[4] Although most styling was extremely intricate and involved days of labor, it was a routine practice.[5]

35.     One of the first things slave masters did to enslaved people forced to American soil was cut their hair.[6] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

36.     The very nature of slavery involved working long hours in dire conditions. Enslaved people had no time to care about their hair.[7] The hair that was once an important spiritual and cultural symbol became tangled and matted.

37.     White Americans did not see African or Black hair as beautiful.[8] African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

---

[2] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).

[3] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-therules.html.

[4] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb., 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[5] Hlonipha Mokoena, *From Slvaery to Colonialism and School Rules, Navigating the History of Myths about Black Hair*, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hairmyths-from-slavery-to-colonialism-school-rules-and-good-hair/.

[6] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[7] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb., 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[8] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-therules.

38.     In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were members of the slave class, even if they were free.[9]

39.     This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.[10]

40.     Because afro-textured hair was kinky and reflected African heritage rather than European ancestry, afro-textured hair was a symbol of low social status.[11]

41.     Slaves with lighter skin and less coily hair were favored to work in the home, a far less strenuous position than in the plantation fields.[12] And so, since the 19th century, Black women have been pressured to adopt Eurocentric standards of beauty, specifically to straighten their kinky, curly or coily hair. This fueled the desire for tools and products that could straighten Black hair texture.[13]

42.     Black, or afro-textured hair, can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in the 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[14]

---

html
[9] Nikki Fox, *6 Things Everyone Should Know About Black Hair History*, Odele, Feb., 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[10] *Fashionable Rebellion*, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settlercolonialism/fashionable-rebellion/.
[11] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[12] *Id.*
[13] *Id.*
[14] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).

43.     The hot comb was first invented by Frenchman, Marcel Grateau, who popularized the hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department stores.[15] The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of black hair products, to be manufactured with wider comb teeth.[16] With Walker's system, once the comb was heated, a softening ointment was then applied for easier manipulation of black hair.[17]

44.     Today, afro-textured hair still is often straightened with a hot comb rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration, creating a shorter or fuller appearance.[18]

///

///

///

///

///

///

///

///

///

---

[15] Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made Millionaire*, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-Case:

[16] Cookie Lommel, Madam C.J. Walker 60 (1993)

[17] *Id* at 62.

[18] *Id.*



45.     African American inventor Garrett Augustus Morgan discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

46.     In addition to being an inventor, Morgan was a tailor. In the early 1900s, Morgan was repairing his sewing machines and creating a way to polish the needles to stitch fabrics more smoothly.[19] He applied a chemical solution to the needles and wiped the solution off with a rag and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[20]

---

[19] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[20] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

47.     Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream, which was marketed in 1913.



48.     Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical-based permanent hair straightening products in the Black hair care market.[21]

49.     In or about 1971, Dark & Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[22]

50.     In the 1970s, lye-relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[23] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in or about 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[24]

---

[21] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[22] Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017
https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.
[23] *Id.*
[24] *Id.*

51.     Today, DEFENDANTS market their hair relaxer PRODUCTS to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. DEFENDANTS' marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.[25] For example:

52.     Defendant L'ORÉAL owns "Mizani Butter Blend Relaxer" and markets these products depicting beautiful, young, happy, fair-skinned African American women with straight hair.



53.     Defendant AVLON owns "Affirm Conditioning Crème Relaxer System".



---

[25] Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017
https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.

54.     Defendant DESIGN ESSENTIALS owns "Design Essentials Regular Conditioning Relaxer".

55.     Defendant DUDLEY'S owns "Dudley's Permanent Crème Relaxer."

56.     Hair relaxers are classified as creams or lotions, which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

57.     Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug and beauty supply stores in urban and rural cities throughout the United States.

58.     Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4 to 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches," resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

59.     Hair relaxers can, and often do, cause burns and lesions on the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; "no-lye" relaxers contain calcium hydroxide and guanidine carbonate; and "thio"

relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

60.     In some studies, up to 90% of Black and Brown women have used hair relaxants and straighteners, which is more commonplace than for any other race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates (known to cause endocrine disruption), which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[26]

61.     Once relaxer use begins in childhood, it usually becomes a lifetime habit.

62.     The reasons for Black women's use and dependence upon hair straightening products are associated with various factors, including (1) slavery and internalization of acceptable beauty norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair maintenance, and (5) culture.[27]

63.     In a culture where Black women feel reduced to a lower standard of beauty, these factors impact women of color's decisions to begin and continue using products to alter the natural state of their hair, many times as a protective mechanism against racial discrimination. In the Dove CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were discovered[28]:

---

[26] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[27] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self Hatred,* New York University Applied Psychology Opus, Fall 2012 Issue (2012)
[28] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/

a.   100% of Black elementary school girls in majority-white schools who report experiencing hair discrimination state they experience the discrimination by the age of ten (10);

b.   86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of twelve (12);

c.   66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments;

d.   53% of Black mothers whose daughters have experienced hair discrimination say their daughters experienced the discrimination as early as five (5) years old;

e.   47% of Black mothers report having experienced discrimination related to their hair;

f.   trauma from hair-discrimination experiences causes girls to miss days from school, with teenage Black girls missing a week of school per year due to hair dissatisfaction;

g.   while 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination each girl endures has an impact on how she sees herself;

h.   Black women are 1.5 times more likely to be sent home from the workplace because of their hair; and

i.   Black women are 80% more likely than white women to change their hair from its natural state to fit in at the office or other social setting.

B.   Regulation of Hair Relaxers

64.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that

17

apply to cosmetics placed into the marketplace. The two most important laws pertaining to cosmetics marketed in the United States are the Federal Food Drug and Cosmetic Act ("FDCA") and the Fair Packaging and Labeling Act ("FPLA.")

65.     The FDCA expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

66.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping or handling.

67.     Under the FDCA a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user or 2) its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

68.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

69.     Under the FDCA, a cosmetic is misbranded if 1) its labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, or 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to Sections 3 and 4 of the Poison Prevention Packaging Act of 1970.[29]

70.     Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[30] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[31]

---

[29] Food and Drug Administration Cosmetic Act § 602 (1938).
[30] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredientscosmetics
[31] 21 Code of Federal Regulations § 700.19.

71.    On May 19, 2022, the FDA issued a rule to amend its food additive regulations relating to phthalates because the use of most previously authorized phthalates as food additives has been abandoned by industry.[32] The FDA revoked authorizations for the food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[33]

72.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients. However, the FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[34]

73.    Except for color additives and ingredients already prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the FDCA and other applicable regulations.[35]

---

[32] § 87 FR 31080
[33] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-foodpackaging-and-food-contact-applications
[34] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDARegulated*, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-howcosmetics-are-not-fda-approved-are-fda-regulated
[35] *Id.*

74.     With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." This warning requirement directly correlates with the broad authority manufacturers have over their own cosmetic products to ensure that such products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under the FDCA and other applicable regulations.

75.     In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers any time a health hazard may be associated with their products. As described herein, a wealth of scientific information is available demonstrating hair relaxers, straighteners and hair dyes contain certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color. There simply was no legal obstacle to but, in fact, was a legal requirement mandating that manufacturers take action as alleged herein.

C.      Endocrine-Disrupting Chemicals

76.     The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[36] The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous

---

[36] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

system, the growth and function of the reproductive system, as well as metabolism and blood sugar levels.[37]

77. The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[38]

78. Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[39]

79. When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[40]

80. The precise functioning of the endocrine system is vital to maintaining hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[41]

81. Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system. They can act directly on hormone receptors as mimics or antagonists of hormones, or on proteins that control hormone delivery.[42]

---

[37] *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system
[38] *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system
[39] *Id.*
[40] *Id.*
[41] *Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8
[42] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

In other words, EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones. They can even modify DNA that regulates whether genes are turned on or off, or alter the structure of target cells' receptors themselves.[43]

82.    As a result, EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, and neurological and learning disabilities.[44]

83.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue, spanning more than two decades, have thus far classified estrogens, phthalates, and parabens as EDCs and demonstrated the adverse impact of EDCs, including Di-2-ethylhexylphthalate, on the male and female reproductive systems.[45]

84.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses. Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations.[46] Cosmetics that may contain phthalates include nail polishes, hair sprays,

[43] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

[44] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrinelibrary/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

[45] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar., 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.

[46] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates

aftershave lotions, cleansers, and shampoos. However, the difference between these other cosmetic products and hair care PRODUCTS is that the nature of and application of these other products make it extremely unlikely their ingredients are absorbed through the skin and into the body through burns or lesions. As alleged, the nature of PRODUCTS and how they are used means that users frequently absorb the PRODUCTS' ingredients into their skin through burns or lesions. The exposure mechanism by which users, including Plaintiff, are exposed to dangerous chemicals like EDCs contained in PRODUCTS are thus unique to hair relaxers and straighteners.

85.     At all relevant times herein, on information and belief, phthalates were used in DEFENDANTS' PRODUCTS.

86.     As mentioned, phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[47] Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[48]

87.     Under the authority of the FPLA, the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

88.     However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, a consumer, including Plaintiff, is not able to determine from the ingredient

---

[47] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
[48] *Id.*

declaration on the label if phthalates were present in a fragrance used in the herein referenced hair PRODUCTS used by the Plaintiff and placed into the stream of commerce by DEFENDANTS.

89.     Since 1999, the Centers for Disease Control have found phthalates in individuals studied for chemical exposure.[49] Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

90.     One such phthalate is Di-2-ethylhexylphthalate63[50] ("DEHP"), which is a highly toxic manufactured chemical[51] that is not found naturally in the environment.[52] It was first used in 1949 in the United States and has been the most abundantly used phthalate derivative in the twentieth century.[53]

91.     DEHP does not covalently bind to its parent material. Non-covalent bonds are weak, and as a result, DEHP readily leaches into the environment increasing human exposure.[54]

92.     Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure.[55] The Agency for Toxic Substances and Disease Registry estimates that the range of

---

[49] *Biomarker Groups*, National Report on Human Exposure to Enviornemntal Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

[50] Also known as Bis(2-ethylhexyl) phthalate.

[51] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International, Feb., 22, 2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.

[52] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[53] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[54] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

[55] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012,

daily human exposure to DEHP is 3–30 µg/kg/day.[56] The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake is 48 µg/kg

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

bodyweight.[57]

> Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[58]

93.     When DEHP enters into the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites, which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[59]

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

[56] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11
https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[57] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[58] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[59] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-

94.     Unsurprisingly, DEHP and its metabolites, like other phthalates, are known to cause significant adverse health effects in humans including, but not limited to, endometriosis, developmental abnormalities, reproductive dysfunction and infertility,[60] various cancers, and metabolic syndrome.[61]

95.     Selected animal studies, along with human epidemiological data, suggest associations between DEHP exposure and reproductive effects.[62] Human epidemiological studies demonstrate an association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males, as well as earlier menopause, low birth weight, pregnancy loss, and preterm birth.[63] In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

96.     Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[64]

D.      Ovarian Cancer Caused by Exposure to Endocrine Disrupting Chemicals

97.     Ovarian cancer is caused by phthalate metabolites found in hair care PRODUCTS.

---

MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).
[60] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/
[61] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
[62] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf
[63] *Id*; N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w
[64] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https: //www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

98.     Every year around 20,000 females develop ovarian cancer in the USA alone.[65] While ovarian cancer is responsible for just 1% of new cancer cases, the 5-year survival rate is only around 50%, resulting in over 13,000 deaths annually.[66]

99.     A study recently found that women who use chemical hair straightening or relaxing products have a higher risk of contracting ovarian cancer.[67]

100.     The hazard ratio for women using hair straightening and relaxing products more than four times in a year was 4.35 (p<.12) for ovarian cancer, compared to women who did not use straightening and relaxing products as often.[68] This was after adjusting for confounders like race and obesity. Although Black women use these products much more frequently than white women, they were not more likely to develop ovarian cancer than white women based on race.

101.     Of course, on a global level, the impact on Black women is more pronounced, meaning that while they are not more likely to develop ovarian cancer based on their race, since they make up the overwhelming majority of hair straightening and hair relaxing products users, including as users of DEFENDANTS' PRODUCTS, across the population more Black women will develop ovarian cancer from use of the PRODUCTS.

102.     The authors of a sister study also had an explanation for why other hair care products, that may also contain EDCs, did not see the same increased risk of cancer[69]:

Notably, chemical exposure through the pathway of hair product use, especially straighteners, could be more concerning than other personal care products. Higher

---

[65] *Cancer Stat Facts: Ovarian Cancer*, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html

[66] *Id.*

[67] Alexandra J. White, et al., Use of hair products in relation to ovarian cancer risk, Carcinogenesis, Oct. 5, 2021, https://pubmed.ncbi.nlm.nih.gov/34173819/.

[68] *Id.*

[69] Che-Jung Chang, et al., Use of Straighteners and Other Hair Products and Incident Uterine Cancer, Journal of the National Cancer Institute, Dec. 8, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/

percutaneous absorption of chemicals has been observed in scalp compared with other skin such as on the forearm, palm, and abdomen (60). Straightener use may cause scalp lesions and burns, which facilitates the permeability of chemicals through the scalp (61,62). Heating processes such as flat ironing or blow drying during straightening treatments could release or thermally decompose chemicals from the products, leading to potential higher exposures to hazardous chemicals among the users (63,64).

E.      Uterine Cancer Caused by Exposure to Endocrine Disrupting Chemicals

103.    Uterine cancer is caused by phthalate metabolites found in hair care PRODUCTS.

104.    Uterine Cancer[70] is among the more common (fourth most) cancers in women in developed countries,[71] accounting for about 3% of all new cancer cases.[72]

105.    Every year around 65,000 females develop uterine cancer in the USA alone, out of which more than 90% is of endometrial origin.[73]

106.    A study recently found that women who use chemical hair straightening or relaxing products have a higher risk of contracting uterine cancer.[74]

107.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but, for frequent users, that risk more than doubles, increasing to 4.05%.[75]

---

[70] Otherwise known as endometrial carcinoma.
[71] Unaiza Faizan & Vijayadershan Muppidi, *Uterine Cancer*, In: StatPearls, National Library of Medicine, Jan 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313/
[72] *Cancer Stat Facts: Uterine Cancer*, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html
[73] *Id.*
[74] Che-Jung Chang, et al., Use of Straighteners and Other Hair Products and Incident Uterine Cancer, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/
[75] *Id.*

108.    More specifically, the hazard ratio for women using hair straightening and relaxing products more than four times in a year was 2.55 ($p<.005$) for uterine cancer, compared to women who did not use straightening and relaxing products as often.[76] This was after adjusting for confounders like race and obesity. Although Black women use these products much more frequently than white women, they were not more likely to develop uterine cancer than white women based on race.

109.    Of course, on a global level, the impact on Black women is more pronounced, meaning that while they are not more likely to develop uterine cancer based on their race, since they make up the overwhelming majority of hair straightening and hair relaxing products users, including as users of DEFENDANTS' PRODUCTS, across the population more Black women will develop uterine cancer from use of the PRODUCTS.

110.    The authors also had an explanation for why other hair care products, that may also contain EDCs, did not see the same increased risk of uterine cancer[77]:

> Notably, chemical exposure through the pathway of hair product use, especially straighteners, could be more concerning than other personal care products. Higher percutaneous absorption of chemicals has been observed in scalp compared with other skin such as on the forearm, palm, and abdomen (60). Straightener use may cause scalp lesions and burns, which facilitates the permeability of chemicals through the scalp (61,62). Heating processes such as flat ironing or blow drying during straightening treatments could release or thermally decompose chemicals from the

---

[76] *Id.*
[77] Che-Jung Chang, et al., Use of Straighteners and Other Hair Products and Incident Uterine Cancer, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/.

products, leading to potential higher exposures to hazardous chemicals among the users (63,64).

F.    Ms. Buchanan's Use of Hair Relaxing PRODUCTS

111.   Ms. Buchanan was first exposed to EDCs and/or other toxic ingredients around 1989, at or around the age of 20, when she began using DEFENDANTS' PRODUCTS. Plaintiff used PRODUCTS from in or around 1989 until in or around 2018. She purchased the PRODUCTS as new for each use on a bimonthly basis.

112.   Ms. Buchanan used DEFENDANTS' PRODUCTS by applying them to her scalp exactly as instructed by DEFENDANTS.

113.   Ms. Buchanan would keep the PRODUCTS on her hair for the time allotted in the instructions.

114.   There was never any indication, on the PRODUCTS' packaging or otherwise, that this normal use could and would cause her to develop ovarian cancer. Had she been made aware of such risk, she would not have used the PRODUCTS. In deciding to use the PRODUCTS, Ms. Buchanan reasonably relied on the directions for use, and warnings, including the absence of cancer risk warnings.

115.   Ms. Buchanan was diagnosed with ovarian cancer in or about March of 2020. She had a total hysterectomy as a result of her cancer diagnosis in March of 2020.

116.   Ms. Buchanan continues to have follow-up appointments.

117.   As a result of DEFENDANTS' acts and/or omissions, Ms. Buchanan has suffered ovarian cancer, extreme pain and suffering, and extreme emotional distress.

## COUNT ONE

## STRICT PRODUCTS LIABILITY

## (FAILURE TO WARN)

118.     Plaintiff incorporates by reference paragraphs 1 through 117 as if fully set forth herein.

119.     At all times material to this action, the DEFENDANTS were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities, cosmetic PRODUCTS in the regular course of business, which are defective and unreasonably dangerous to users and/or consumers of the product, including Plaintiff.

120.     At all times material to this action, the PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

a.   They contained warnings insufficient to alert consumers, including Plaintiff herein, of the dangerous risks of PRODUCTS, and the comparative severity, duration and the extent of the risks and reactions;

b.   They contained warnings insufficient to alert consumers, including Plaintiff herein, of the propensity to cause a substantial increased risk of serious bodily harm, specifically including, but not limited to, ovarian cancer;

c.   They contained warnings insufficient to alert consumers, including Plaintiff herein, that the dangerous EDCs or other toxic ingredients contained in PRODUCTS were made more dangerous by the nature by which PRODUCTS are

used in their ordinary course, namely that the risk of lesions or burns and of associated heating processes involved in straightening or relaxing hair exacerbate the toxic effects of the EDCs or other chemicals contained in PRODUCTS; and

d. The warnings that were given by the DEFENDANTS, if any, were neither accurate, nor clear, and/or were ambiguous.

121.  Plaintiff could not have discovered any defect in PRODUCTS through the exercise of reasonable care.

122.  DEFENDANTS, as manufacturers, sellers and/or distributors of cosmetic PRODUCTS, are held to the level of knowledge of an expert in the field. Specifically, at all times material to this action, DEFENDANTS knew or should have known that the use of phthalates and other EDCs in hair PRODUCTS significantly increases the risk of ovarian cancer, based upon scientific knowledge dating back decades.

123.  Plaintiff reasonably relied on the skill, superior knowledge, and judgment of DEFENDANTS.

124.  DEFENDANTS had a continuing duty to warn the Plaintiff of the dangers associated with the use of PRODUCTS.

125.  Plaintiff used PRODUCTS on her scalp for their intended purpose as hair relaxers and straighteners.

126.  Had Plaintiff received adequate warnings regarding the risks of PRODUCTS, Plaintiff would not have used them.

127.  As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered injuries as set forth above.

**COUNT TWO**

**STRICT PRODUCTS LIABILITY**

**(DESIGN DEFECT)**

128.    Plaintiff incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

129.    At all times material to this action, DEFENDANTS, and each of them, were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities, the cosmetic PRODUCTS, which are defective and unreasonably dangerous to users and/or consumers of the PRODUCTS, including Plaintiff.

130.    At all times material to this action, PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

   a.  When placed in the stream of commerce, PRODUCTS contained unreasonably dangerous design defects and were not reasonably safe and fit for their intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of each product, including Plaintiff, to risks which exceeded the benefits of the product;

   b.  The PRODUCTS did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way;

   c.  The PRODUCTS were insufficiently tested;

33

      d.   The PRODUCTS caused harmful side effects that outweighed any potential utility;

      e.   The PRODUCTS were more dangerous than other hair straighteners and products on the market; and

      f.   The PRODUCTS were not accompanied by adequate labeling or instructions for use to fully apprise the public and consumers, including Plaintiff, of the potential risks and serious side effects associated with its use.

131.   In light of the potential and actual risk of harm associated with the PRODUCTS' use, a reasonable person who had actual knowledge of this potential risk of harm would have concluded PRODUCTS should not have been marketed in that condition.

132.   There existed safer alternative designs, but DEFENDANTS chose to market a more dangerous design. Importantly, the PRODUCTS are inessential cosmetic products that do not treat or cure any serious disease. Further, safer alternatives, including fragrance-free PRODUCTS, have been readily available for decades.

133.   At all times material to this action, DEFENDANTS knew that PRODUCTS would be purchased by members of the general public and would be used by such purchasers without any inspections for defects, and would rely upon the representations made by DEFENDANTS on the product labels and in their marketing, including public statements and promotional and sales materials.

134.   At all times material to this action, PRODUCTS were expected to reach, and did reach, consumers in the State of Texas and throughout the United States, including Plaintiff, without substantial change in the condition in which they were sold.

135.    DEFENDANTS knew or should have known of the defective nature of PRODUCTS but continued to research, develop, design, test, manufacture, package, formulate, inspect, label, distribute, market, promote, sell and otherwise release these PRODUCTS into the stream of commerce so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their PRODUCTS, including ovarian cancer and other health problems.

136.    At all times, Plaintiff used PRODUCTS for their intended or reasonably foreseeable purpose as hair straighteners and relaxers.

137.    As a direct and proximate result of the defective and unreasonably dangerous condition of PRODUCTS and of their failure to perform safely, Plaintiff suffered injuries as set forth above.

## COUNT THREE

## STRICT PRODUCTS LIABILITY

### (MANUFACTURING DEFECT)

138.    Plaintiff incorporates by reference paragraphs 1 through 137 as if fully set forth herein.

139.    At all times material to this action, DEFENDANTS, and each of them, were responsible for manufacturing, testing, packaging, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities the cosmetic PRODUCTS, which are defective and unreasonably dangerous to users and/or consumers of the product, including Plaintiff.

140.    At all times material to this action, PRODUCTS were manufactured, distributed, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, one or more of the following particulars:

a.    When placed in the stream of commerce, PRODUCTS were of a substandard condition in that they contained contaminants which were not intended to be a part of the PRODUCTS, which rendered the PRODUCTS unreasonably dangerous when used for their intended and foreseeable purpose;

b.    When placed in the stream of commerce, PRODUCTS were of a substandard condition in that they contained unintended or incorrect ratios or quantities of ingredients, which rendered the PRODUCTS unreasonably dangerous when used for their intended and foreseeable purpose; and

c.    When placed in the stream of commerce, PRODUCTS were of a substandard condition in that they contained contaminants which were not intended to be a part of the PRODUCTS, which rendered the PRODUCTS unreasonably dangerous and which caused them to differ from other ostensibly identical units of the same product line.

141.    In light of the potential and actual risk of harm associated with the PRODUCTS' use, a reasonable person who had actual knowledge of this potential risk of harm would have concluded PRODUCTS should not have been marketed in that condition.

142.    At all times relevant herein, DEFENDANTS knew that PRODUCTS would be purchased by members of the general public and would be used by such purchasers without any inspections for defects, as such purchasers would rely upon the representations made by DEFENDANTS.

143. At all times material to this action, PRODUCTS were expected to reach, and did reach, consumers in the State of Texas and throughout the United States, including Plaintiff, without substantial change in the condition in which they were sold.

144. DEFENDANTS knew or should have known of the defective nature of PRODUCTS but continued to manufacture, package, formulate, inspect, label, distribute, sell and otherwise release these PRODUCTS into the stream of commerce so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by their PRODUCTS, including the foreseeable harm of ovarian cancer and other health problems.

145. At all times, Plaintiff used PRODUCTS on her scalp for their intended or reasonably foreseeable purpose as hair straighteners and relaxers.

146. As a direct and proximate result of the defective and unreasonably dangerous condition of PRODUCTS and of their failure to perform safely, Plaintiff suffered injuries as set forth above.

## COUNT FOUR

### NEGLIGENCE

147. Plaintiff incorporates by reference paragraphs 1 through 146 as if fully set forth herein.

148. At all times herein mentioned, DEFENDANTS had a duty to exercise reasonable care in the designing, developing, manufacturing, testing, packaging, distributing, labeling, and/or selling, and otherwise releasing into the stream of commerce, PRODUCTS.

149. DEFENDANTS breached their duty of reasonable care to Plaintiff in that they negligently designed, tested, inspected, packaged, manufactured, distributed, and/or sold

PRODUCTS. Specifically, DEFENDANTS failed to exercise reasonable care in ways which included, but were not limited to, one or more of the following particulars:

a. In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff herein, of the dangerous and defective characteristics of PRODUCTS;

b. In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff herein, of the propensity of PRODUCTS to cause side effects, serious injury and death;

c. In their failure to adequately research PRODUCTS;

d. In representing that PRODUCTS were safe and effective for their intended use when, in fact, the PRODUCTS were unsafe for their intended use;

e. In failing to perform appropriate, reliable and valid pre-market testing PRODUCTS;

f. In failing to perform appropriate post-market testing of PRODUCTS;

g. In using EDCs or other toxic chemicals in PRODUCTS;

h. In failing to properly manufacture PRODUCTS;

i. In failing to remove the PRODUCTS from the market when DEFENDANTS knew or should have known the PRODUCTS were defective;

j. In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of ovarian cancer; and

k. In failing to perform appropriate post-market surveillance of PRODUCTS.

150.    DEFENDANTS knew or should have known that consumers, such as Plaintiff herein, would foreseeably suffer injury as a result of DEFENDANTS' failure to exercise reasonable and ordinary care.

151.    As a direct and proximate result of DEFENDANTS' carelessness and negligence, and of the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered severe and permanent injuries as alleged herein.

### COUNT FIVE

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT

152.    Plaintiff incorporates by reference paragraphs 1 through 151 as if fully set forth herein.

153.    The Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.46, states that, "(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Subsection (b) states that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the following acts:" "(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not", "(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another", "(9) advertising goods or services with intent not to sell them as advertised", or "(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."

154. By the conduct described in detail above and incorporated herein, DEFENDANTS engaged in unfair or deceptive acts in violation of the Texas Deceptive Trade Practices-Consumer Protection Act.

155. Plaintiff purchased and used DEFENDANTS' PRODUCTS primarily for personal use and thereby suffered ascertainable losses as a result of DEFENDANTS' actions in violation of the Texas consumer protection laws.

156. DEFENDANTS engaged in wrongful conduct while at the same time obtaining, under false pretenses, monetary gain from Plaintiff for the PRODUCTS that would not have been paid had DEFENDANTS not engaged in unfair and deceptive conduct.

157. DEFENDANTS engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

   a. In representing that PRODUCTS were safe and effective for their intended use when, in fact, the PRODUCTS were unsafe for their intended use;

   b. In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff herein, of the dangerous and defective characteristics of PRODUCTS;

   c. In their failure to warn or instruct and/or adequately warn or adequately instruct the public and consumers, including Plaintiff herein, of the propensity of PRODUCTS to cause side effects, serious injury and death;

   d. In their failure to adequately research PRODUCTS;

   e. In representing that PRODUCTS were safe and effective for their intended use when, in fact, the PRODUCTS were unsafe for their intended use;

f.  In failing to perform appropriate, reliable and valid pre-market testing PRODUCTS;

g.  In failing to perform appropriate post-market testing of PRODUCTS;

h.  In using EDCs or other toxic chemicals in PRODUCTS;

i.  In failing to properly manufacture PRODUCTS;

j.  In failing to remove the PRODUCTS from the market when DEFENDANTS knew or should have known the PRODUCTS were defective;

k.  In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the PRODUCTS which caused increased risk of ovarian cancer; and

l.  In failing to perform appropriate post-market surveillance of PRODUCTS; and

m.  In engaging in unfair, unconscionable, deceptive, or abusive conduct that creates a likelihood of confusion or misunderstanding.

158.  DEFENDANTS intended for Plaintiff to rely on their representations and advertisements regarding the PRODUCTS in order to achieve monetary gain from Plaintiff through her purchase of the PRODUCTS.

159.  Plaintiff was injured by the cumulative and indivisible nature of DEFENDANTS' conduct. The cumulative effect of DEFENDANTS' conduct directed at Plaintiff and other consumers was to create demand for and sell the PRODUCTS. Each aspect of DEFENDANTS' conduct combined to artificially create sales of the product.

160.    DEFENDANTS have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the PRODUCTS.

161.    Had DEFENDANTS not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the PRODUCTS, and would not have incurred related injuries and damages.

162.    DEFENDANTS' intentional, deceptive, unconscionable, and abusive representations and material omissions to Plaintiff, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of Texas consumer protection laws.

163.    DEFENDANTS' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of Texas consumer protection laws.

164.    Under these statutes, DEFENDANTS are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

165.    DEFENDANTS violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that DEFENDANTS' the PRODUCTS were fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

166.    The actions and omissions of DEFENDANTS alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against

unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

167.    DEFENDANTS had actual knowledge of the defective and dangerous condition of DEFENDANTS' PRODUCTS and failed to take any action to cure such defective and dangerous conditions.

168.    Plaintiff relied upon DEFENDANTS' misrepresentations and omissions in determining which PRODUCT to purchase and use.

169.    As a direct and proximate result of DEFENDANTS' violations of the State of Texas' consumer protection laws, Plaintiff sustained the following ascertainable losses and damages:

    a.    Economic losses including medical care and lost earnings; and

    b.    Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT SIX

### BREACH OF IMPLIED WARRANTIES

170.    Plaintiff incorporates by reference paragraphs 1 through 169 as if fully set forth herein.

171.    At all times, DEFENDANTS impliedly warranted that PRODUCTS were safe, effective and fit for use by consumers and users, including Plaintiff, for their intended use as a hair straightener and relaxer, that they were of merchantable quality, that they did not produce dangerous side effects, and that they were adequately tested and fit for their intended purpose.

172. At the time of making these warranties, DEFENDANTS knew or should have known that, in fact, the representations and warranties were false, misleading, and untrue in that PRODUCTS were not safe, effective and fit for use by consumers and users, including Plaintiff, for their intended use as a hair straightener and relaxer, that they were not of merchantable quality, that they did produce dangerous side effects, including ovarian cancer and other injuries as herein alleged, and that they were not adequately tested or fit for their intended purpose.

173. Members of the public, including Plaintiff, reasonably relied upon the skill and judgment of DEFENDANTS and upon said implied warranties in using PRODUCTS.

174. Plaintiff used PRODUCTS for their intended purpose as a hair relaxer and straightener.

175. DEFENDANTS breached said implied warranties, in that, PRODUCTS were not safe, effective and fit for their intended purpose as a hair straightener or relaxer, were not of merchantable quality, and, in fact, caused serious and potentially lethal side effects to consumers when used as recommended, including ovarian cancer and other injuries as herein alleged.

176. Due to DEFENDANTS' wrongful conduct as alleged herein, Plaintiff could not have known about the nature of the risks and side effects associated with PRODUCTS until after she used them.

177. As a direct and proximate result of the DEFENDANTS' breach of implied warranties and the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered injuries as set forth above.

## COUNT SEVEN

## NEGLIGENT FAILURE TO RECALL

178.     Plaintiff incorporates by reference paragraphs 1 through 177 as if fully set forth herein.

179.     At all times material to this action, the DEFENDANTS were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling, directly and indirectly, through third parties or related entities, the cosmetic PRODUCTS in the regular course of business, which are defective and unreasonably dangerous to users and/or consumers of the PRODUCTS, including Plaintiff.

180.     At all times material to this action, the PRODUCTS were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by DEFENDANTS in a defective and unreasonably dangerous condition in ways which included, but were not limited to, the fact they contained EDCs which were known or should have been known cause ovarian cancer, especially when used on the scalp in products that cause lesions or burns and in combination with heating techniques, which further increase the dermal absorption and risk of exposure to EDCs and PRODUCTS.

181.     DEFENDANTS became aware of the dangerous nature of the PRODUCTS after PRODUCTS were sold to the public and after PRODUCTS were sold to Plaintiff. Specifically, at all times material to this action, DEFENDANTS knew or should have known that the use of phthalates and other EDCs in hair PRODUCTS significantly increases the risk of ovarian cancer, based upon scientific knowledge dating back for decades.

182.     DEFENDANTS failed to recall PRODUCTS.

183.     A reasonable manufacturer, seller and/or distributor of dangerous cosmetic products that can cause cancer would under the circumstances have recalled PRODUCTS.

184.    Plaintiff could not have discovered any defect in PRODUCTS through the exercise of reasonable care.

185.    Plaintiff reasonably relied on the skill, superior knowledge, and judgment of DEFENDANTS.

186.    Had the PRODUCTS been properly recalled, Plaintiff would not have used them. As a direct and proximate result of the defective and the unreasonably dangerous and defective characteristics of PRODUCTS, Plaintiff suffered injuries as set forth above.

## COUNT EIGHT

### PUNITIVE DAMAGES

187.    Plaintiff incorporates by reference paragraphs 1 through 183 as set forth herein.

188.    DEFENDANTS' conduct, as described above, was intentional, willful wanton, oppressive, malicious, and reckless, evidencing such an entire want of care as to raise the presumption of a conscious indifference to the consequences in that DEFENDANTS acted only out of self-interest and personal gain.  Such conduct evidences a specific intent to cause harm to Plaintiff as provided under Tex. Civ. Prac. & Rem. Code Ann. § 41.003.  Accordingly, punitive damages should be imposed against DEFENDANTS pursuant Tex. Civ. Prac. & Rem. Code Ann. § 41.003 and other applicable laws, to punish and deter DEFENDANTS from repeating or continuing such unlawful conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against DEFENDANTS on each of the above-referenced claims and causes of action, and as follows:

1.  Awarding past and future non-economic damages in excess of $75,000, including, but not limited to pain, suffering, discomfort, fright, nervousness, anxiety, worry,

apprehension, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding past and future economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

3. Awarding punitive damages;

4. Prejudgment interest;

5. Post-judgment interest;

6. Awarding Plaintiff's reasonable attorneys' fees;

7. Awarding Plaintiff the costs of these proceedings; and

8. Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: <u>June 23, 2023</u>                    Respectfully submitted by:

Anne Andrews, Esq. (CA Bar No. 103280)
Sean Higgins, Esq. (CA Bar No. 266888)
Robert Siko, Esq. (CA Bar No. 312856)
**ANDREWS & THORNTON**
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (949) 748-1000
Facsimile: (949) 315-3540
*(Pro Hac Vice forthcoming)*